IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

ALLYSIA MARIE CHRISTIAN,　　　　　)　　CASE NO.  3:20-CV-01617-JDG
　　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiff,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　vs.　　　　　　　　　　　　　　)　　MAGISTRATE JUDGE
　　　　　　　　　　　　　　　　　　)　　JONATHAN D. GREENBERG
COMMISSIONER OF SOCIAL　　　　　　)
SECURITY,　　　　　　　　　　　　　)　　**MEMORANDUM OF OPINION AND**
　　　　　　　　　　　　　　　　　　)　　**ORDER**
　　　　　　Defendant.　　　　　　　)

Plaintiff, Allysia Christian ("Plaintiff" or "Christian"), challenges the final decision of Defendant,

Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her application for

a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set

forth below, the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

In July 2017, Christian filed an application for POD and DIB, alleging a disability onset date of

September 4, 2013[2] and claiming she was disabled due to: multiple sclerosis; migraines; fatigue; anxiety;

confusion; memory loss; body weakness due to environment temperature changes; and nerve pain in her

extremities due to MS. (Transcript ("Tr.") at 39, 337-38, 350.)   The applications were denied initially and

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.
[2] Christian later amended her onset date to February 1, 2016.  (Transcript ("Tr.") at 39.)

upon reconsideration, and Christian requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 39.)

On June 3, 2019, an ALJ held a hearing, during which Christian, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On July 8, 2019, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 39-55.)  The ALJ's decision became final on June 15, 2020, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On July 22, 2020, Christian filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 17-18.)  Christian asserts the following assignments of error:

(1) It was error for the ALJ to find Claimant did not meet or equal adult medical listing 11.09.

(2) The ALJ erred by failing to contact Dr. Koffman, afford greater weight to his opinion (as he prescribed the wheelchair) and/or address the wheelchair issue further with the vocational expert.

(3) The ALJ erred by failing to conduct a proper credibility assessment of the claimant's testimony.

(4) The ALJ erred in failing to take into account Claimant's need to use a wheelchair at work.

(5) The ALJ mischaracterized the claimant's performance of some activities of daily living as proof she was not disabled.

(Doc. No. 15 at 1, 9, 11-12.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Epps was born in December 1986 and was 32 years-old at the time of her administrative hearing (Tr. 53), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(c),

416.963(c).  She has at least a high school education and is able to communicate in English.  (Tr. 53.)  She has past relevant work as a press tender and line worker.  (*Id.*)

## B.    Relevant Medical Evidence[3]

Treatment providers diagnosed Christian with multiple sclerosis ("MS") in 2013.  (*Id.* at 698.)  A May 5, 2016 brain MRI showed progression of MS, with a few new lesions and moderate lesion burden, but no associated brain atrophy.  (*Id.* at 514-15.)

On November 15, 2016, Christian saw her neurologist, Dr. Boyd Koffman, for follow up.  (*Id.* at 694-95.)  Christian reported headaches, fatigue, muscle aches and arthralgias/joint pain, tingling in her legs, and an intermittently imbalanced gait where she had to hold onto furniture.  (*Id.* at 696-98.)  On examination, Dr. Koffman found normal muscle strength, bulk, and tone, normal coordination, and normal gait.  (*Id.* at 699.)  Dr. Koffman determined Christian's neurologic exam appeared normal, despite "a number of neurologic sequalae (fatigue, pain, numbness)."  (*Id.* at 700.)  Dr. Koffman noted Christian's MS appeared clinically stable on the medication Gilenya.  (*Id.* at 701.)

At her yearly physical in April 2017, Christian denied having joint pain or joint swelling.  (*Id.* at 528, 531.)  On examination, primary care provider Dr. Mark Davis found normal physical findings, normal neurologic exam, and normal attention span and concentration.  (*Id.* at 531.)

On July 18, 2017, Christian saw Dr. Koffman for follow up.  (*Id.* at 687.)  Christian reported fatigue, change in appetite, muscle aches, arthralgias/joint pain, neck pain, numbness, tingling in her arms and legs, vertigo, anxiety, confusion, memory loss, headaches, and bilateral hip pain.  (*Id.* at 689-90.)  On

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs. The Court notes Plaintiff's counsel failed to comply with the Court's Initial Order (Doc. No. 6) with respect to the "Facts" section of the brief and did not set forth a recitation of the relevant medical evidence in that portion of the brief.  Therefore, the Court further limits its discussion of the evidence to the medical evidence set forth in Defendant's brief.

examination, Dr. Koffman found normal muscle strength, bulk, and tone, normal coordination, and normal gait. (*Id.* at 691-92.) Dr. Koffman determined Christian's neurologic exam appeared normal, despite "a number of neurologic sequalae (fatigue, pain, numbness)." (*Id.* at 693.) Dr. Koffman noted Christian had "a number of subjective symptoms with out [sic] long tract findings" and that Christian appeared "clinically and radiographically stable" on Gilenya. (*Id.*)

A June 29, 2017 MRI revealed that the dominant lesion in Christian's left frontal white matter had "greatly decreased in size compared to the prior MRI," and there was nothing to suggest active demyelination. (*Id.* at 692.)

On November 28, 2017, Christian saw Rachel Fisher, CNP, for complaints of back spasms and cramps for the past week that were worse over the past two days. (*Id.* at 852.) Christian reported the pain could be from her MS, but she wanted to make sure she had not hurt herself since the symptoms were different. (*Id.*) Christian also complained of increased numbness and tingling with this back pain. (*Id.*) Riding in a car, walking, and bending over aggravated her pain, and the back spasms were triggering headaches. (*Id.*) On examination, Fisher found right-side thoracic muscle spasm and tightness, no spinal point tenderness, increased pain with hyperextension and right-side rotation in the soft tissue of the right thoracic area, normal range of motion of all joints, normal sensation, normal reflexes, normal coordination, normal muscle strength and tone, and normal attention span and concentration. (*Id.* at 855.) Fisher diagnosed muscle spasm of the thoracic back and prescribed Cyclobenzaprine, Percocet, and a Medrol dose pack. (*Id.* at 855-56.)

On January 22, 2018, Christian saw Dr. Davis for follow up. (*Id.* at 847.) Christian complained of chest congestion and reported her cold symptoms were affecting her MS. (*Id.*) Christian stated she felt like she was having both an MS flare and cold/chest congestion. (*Id.*) Christian reported she had called her neurologist reporting the MS flare and he told her to follow up with Dr. Davis. (*Id.*) Christian stated

she had been out of her MS medication for two weeks because it had not been delivered to her.  (*Id.*)
Christian complained of low energy levels and stated she wanted to rest all the time.  (*Id.*)  Christian also
reported joint pain, muscle weakness, loss of strength, and muscle aches.  (*Id.* at 848.)  Dr, Davis
diagnosed cough and ear infection, ordered a chest x-ray, and prescribed medication, including a Medrol
dose pack.  (*Id.* at 849-50.)

On January 30, 2018, Christian saw Dr. Koffman for follow up.  (*Id.* at 800.)  Christian reported
abdominal pain, muscle aches and weakness, muscle spasm and cramps, dizziness, frequent headaches,
migraines, fatigue, easy bruising, tingling in her legs, an intermittently imbalanced gait when tired where
she holds furniture, and trouble going down stairs.  (*Id.* at 802-03.)  Christian told Dr. Koffman that when
she was not ill, she may go to the gym several times a week, although she reported annoying or painful
tingling in her legs, as well as fatigue, after exercising.  (*Id.* at 803.)  On examination, Dr. Koffman found
normal muscle strength, bulk, and tone, normal coordination, normal gait, intact sensation to vibration,
and diminished appreciation of cold in a "glove and stocking distribution" of the upper and lower
extremities bilaterally.  (*Id.* at 804.)  Dr. Koffman determined Christian's neurologic exam "suggest[ed]
spinothalamic tract involvement."  (*Id.* at 806.)  Christian denied any clinical attack or clinical progression
since her last visit.  (*Id.* at 806.)  Dr. Koffman noted Christian's MS appeared clinically stable on the
medication Gilenya.  (*Id.*)

On May 15, 2018, Christian saw Robin Landon, CNP, for her annual physical.  (*Id.* at 841.)
Christian complained of memory issues that worsened during MS flares, but the medication Dr. Koffman
prescribed for it helped.  (*Id.*)  Her children helped her to remember appointments.  (*Id.*)  However, she
had recently lost her purse and her Percocet was stolen.  (*Id.*)  Christian reported her headaches or
migraines caused MS flares, and her symptoms during these flares included tingling of the legs or leg
pain, joint pain, muscle spasms/cramps, bowel/bladder issues at times, and occasional vision difficulties.

5

(*Id.* at 842.)  On examination, Landon found full range of motion in all joints with no edema, normal muscle strength and tone, normal coordination and reflexes, normal sensation, and normal attention span and concentration.  (*Id.* at 845.)  Landon offered to increase Christian's anxiety medication in case stress was a trigger for her MS, but Christian declined.  (*Id.*)

A June 20, 2018 brain MRI showed stable findings compatible with Christian's diagnosis of MS, no new or progressed lesions, and no enhancing legions to suggest active demyelination.  (*Id.* at 1055.)

The next day, Dr. Koffman wrote a prescription for Christian to receive a lightweight manual wheelchair to be used daily as needed for fatigue.  (*Id.* at 1566.)

On November 30, 2018, Christian saw Dr. Davis for complaints of overall fatigue, bladder issues, headaches, and possible MS flare for about one to two weeks that had gotten worse over the past few days.  (*Id.* at 823.)  Christian also reported increased fatigue and increased achiness.  (*Id.* at 824.)  Christian denied muscle cramps, joint swelling, back pain, stiffness, loss of strength, difficulty with concentration, poor balance, coordination disturbances, tingling, falling down, tremors, and memory loss.  (*Id.* at 826.)  On examination, Dr. Davis found normal extremities, weakness throughout on the neurologic examination, and normal attention span and concentration.  (*Id.* at 827.)  Dr. Davis prescribed a prednisone burst for Christian's MS flare and suggested physical therapy to help with her MS.  (*Id.* at 828.)

**C.    State Agency Reports**

On August 30, 2017, Karla Delcour, Ph.D., found Christian's psychological impairment was not severe.  (*Id.* at 342.)   On November 16, 2017, on reconsideration, Irma Johnston, Psy.D., affirmed Dr. Delcour's findings.  (*Id.* at 355.)

6

On September 5, 2017, Gerald Klyop, M.D., adopted the RFC dated January 19, 2016 under AR 98-4 (Drummond Ruling).  (*Id.* at 344.)  On November 17, 2017, Indira Jasti, M.D., affirmed Dr. Klyop's findings.  (*Id.* at 356-57.)

## D.   Hearing Testimony

During the June 3, 2019 hearing, Christian testified to the following:

- She lives with her husband and five children.  (*Id.* at 65.)  At one point, she had been homeschooling her children, but stopped at the start of the 2018/2019 school year. (*Id.*)  She has a driver's license and drives four to five times a week, but her legs get tired, and it becomes difficult to move her leg from one pedal to the other.  (*Id.* at 65-66.)  She also gets tired and does not have the ability to pay attention to what is going on around her.  (*Id.* at 66.)

- For the past year and a half, she has had a hard time comprehending what she reads. (*Id.*)

- She stopped working at Whirlpool when she got diagnosed with MS.  (*Id.* at 69.)  She feels she cannot work because her physical abilities are not the same.  (*Id.* at 70.)  Her legs give her the most trouble, and she cannot walk around, get around, or stand in the way she did before.  (*Id.*)  She also has cognitive issues.  (*Id.*)  She has a hard time thinking of a word she wants to use, or she forgets to do things.  (*Id.* at 81.)  Her arms and hands get tired, and she gets numbness and tingling in them that causes it to hurt to touch things.  (*Id.* at 76.)  Her reflexes are not the same and sometimes she drops things without realizing it.  (*Id.*)  She gets MS flares that last a day or so and MS attacks that could last from a couple of weeks to a couple of months.  (*Id.* at 79.) During attacks, her husband would need to help her up and down the stairs and she only goes up and down once.  (*Id.* at 80.)  She would need to use her wheelchair a lot more and she would avoid going places more.  (*Id.*)  She would need a lot more help. (*Id.*)  Her fatigue during attacks gets so bad she may not be able to keep her eyes open.  (*Id.*)  She gets attacks two or three times a year.  (*Id.* at 81.)

- On an average day, she wakes up, and depending on her ability that day, it may take her one hour or three hours to get ready.  (*Id.* at 71.)  If she is really sore, has muscle cramps, her legs are too weak, or is fatigued, her husband may need to help her shower or get dressed.  (*Id.*)  She spends the rest of her day relaxing at home.  (*Id.*) She does not do any housework.  (*Id.*)  Her husband takes care of lunch.  (*Id.*)  She may sit and visit with him or watch TV with him.  (*Id.*)  That way, when she has to get her children from school, she is able to and feels she has the energy to drive to pick them up at the bus stop.  (*Id.*)  If she does not have the energy, she makes arrangements with a friend or family member to pick them up.  (*Id.* at 71-72.)  She then supervises the children while they do homework and chores.  (*Id.* at 72.)  Her

children usually prepare dinner.  (*Id.*)  She is not comfortable taking the children anywhere by herself, so if she does go out with them, she has to get a friend of the family or someone to go with her.  (*Id.*)

- She does not go anywhere anymore because it's too much energy.  (*Id.*)  If they do go someplace, it takes a lot of planning.  (*Id.*)  Another adult needs to go with her that can push her in her wheelchair because she cannot walk very much.  (*Id.*)  She has to take her cane with her so she does not fall because her legs get weak and feel like they are going to give out.  (*Id.* at 72-73.)

- She uses her cane daily, especially if she is leaving the house.  (*Id.* at 73.)  She uses the wheelchair "maybe a couple times a month," but she does not leave the house much so she uses it if she leaves the house and is "going to be going somewhere where we might walk around, like to the mall or to another family type of function where we might out [sic] doing errands or walking a lot . . . ."  (*Id.*)  If she had to spend a day working like she had in the past, she would not be able to get through the place with a wheelchair, so she would need to take her cane.  (*Id.* at 74.)  She would need to take her cane to get around, like going up and down stairs or walking distances in case her legs get tired.  (*Id.*)

-  She is only alone for an hour or two a day.  (*Id.*)  Her husband works second shift, so when he leaves for work, it is only an hour or two before her children get home from school.  (*Id.*)

The VE testified Christian had past work as a press tender and line worker.  (*Id.* at 85.)  The ALJ then posed the following hypothetical question:

> For hypothetical number one, please assume a hypothetical individual of the claimant's age, education, and work experience who would be limited to performing work at the light exertional level with lifting, sitting, standing, -- I'm sorry, lifting, carrying, sitting, standing and walking consistent with light work. The individual could frequently handle and finger with the bilateral upper extremities.  Occasional climbing of ramps and stairs, but no climbing of ladders, ropes, or scaffolds.  No exposure to unprotected heights or moving mechanical parts.  And the individual would need to avoid concentrated exposure to extreme cold or extreme heat.  Additionally, the individual would be limited to performing simple, routine, repetitive tasks.  The individual could not perform work at a production rate pace, but could perform goal-oriented work.  The individual would be limited to simple work-related decisions and the individual would be limited to performing – I'm sorry – to few changes in a routine work setting.  And I'm sorry, also Mr. Pinti, let's indicate that the individual would need to avoid concentrated exposure to humidity and wetness.  Mr. Pinti, based on those limitations, first of all, could the hypothetical individual perform any of the claimant's past work?

8

(*Id.* at 85-86.)

The VE testified the hypothetical individual would not be able to perform Christian's past work as a press tender and line worker.  (*Id.* at 86.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as housekeeping, cleaner; inspector; and packager.  (*Id.*)

The ALJ then changed the exertional level to sedentary.  (*Id.*)  The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as inspector; document preparer; and order clerk.  (*Id.* at 86-87.)

The ALJ asked the VE whether the addition of a cane for balance and ambulation would affect the VE's testimony.  (*Id.* at 87.)  The VE testified that would rule out light work, but it would not affect the sedentary jobs as they could be done sitting and so could be done with the use of a cane.  (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 404.1520(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. § 404.1520(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 404.1520(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.   20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Christian was insured on her alleged disability onset date, February 1, 2016, and remained insured through September 30, 2019, her date last insured ("DLI").  (Tr. 39-40.) Therefore, in order to be entitled to POD and DIB, Christian must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

10

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2019.

2. The claimant has not engaged in substantial gainful activity since September 4, 2013, the alleged onset date (20 CFR 404.1571, *et seq*).

3. The claimant has the following severe impairments: multiple sclerosis, migraines, history of coccyx fracture, dextroscoliosis of the lumbar spine, obesity, depressive disorder, and neurocognitive disorder (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a), subject to the following limitations: (2) frequent handling and fingering bilaterally; (2) occasional climbing of ramps and/or stairs, but no climbing of ladders, ropes, or scaffolds; (3) no exposure to unprotected heights or moving mechanical parts; (4) no concentrated exposure to cold, heat, wetness, or humidity; (5) must be permitted use of a cane for balance and ambulation; (6) limited to performing simple, repetitive, routine tasks involving no more than simple work-related decisions; (7) cannot perform production rate work, but can perform goal-oriented work; and (8) limited to few changes in a routine work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on December **, 1986 and was 26 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual
        functional capacity, there are jobs that exist in significant numbers in the national
        economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.     The claimant has not been under a disability, as defined in the Social Security
        Act, from September 4, 2013, through the date of this decision (20 CFR
        404.1520(g)).

(Tr. 42-54.)

## V.     STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social

Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).

Specifically, this Court's review is limited to determining whether the Commissioner's decision is

supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r*

*of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir.

2009).   Substantial evidence has been defined as "'more than a scintilla of evidence but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y*

*of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).   In determining whether an ALJ's

findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make

credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d

679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v.*

*Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).   The findings of the Commissioner are not

subject to reversal, however, merely because there exists in the record substantial evidence to support a

different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800

F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)

12

("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.    Listing 11.09

Christian argues that the "longitudinal record evidence" shows "disorganization in all of her extremities and . . . an extreme limitation [in] balancing, standing from a seating position,

13

standing/walking, and using her upper extremities." (Doc. No. 15 at 2.)  Christian further argues that, "[a]t a minimum she has a marked limitation in physical functioning" since she has been prescribed a cane and a wheelchair for ambulation, and "a marked limitation under (B)(1), (B)(3) or (B)(4) due to her chronic headaches, fatigue, and brain fog which result in near total dependence on friends and family." (*Id.*)

The Commissioner responds that substantial evidence supports the ALJ's determination that Christian did not meet or equal Listing 11.09.  (Doc. No. 17 at 4.)

In reply, Christian argues that her symptoms are at their worst when she has an MS attack or flare, when she is "least likely to leave the house and see a doctor." (Doc. No. 18 at 1.)  Therefore, she asserts "there is not as much objective evidence confirming 'the worst' of her symptoms as one would expect considering the severity of her condition." (*Id.*)  Christian instead points to her MS diagnosis, years of treatment with multiple providers, and her prescription for a cane and wheelchair in support.  (*Id.*) Christian then relies on treatment notes post-dating the ALJ's decision.[4]  (*Id.* at 2.)

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the Listing of Impairments.  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a).  Essentially, a

---

[4] The Sixth Circuit has repeatedly held "evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  The Court notes Christian makes no Sentence Six argument in her briefs.  (Doc. Nos. 15, 18.)

claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c)(3).  It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment.  *See e.g. Lett v. Colvin*, No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015).  A claimant must satisfy all of the criteria to "meet" the listing.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).  A claimant is also disabled if his impairment is the medical equivalent of a listing, 20 C.F.R. § 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011).  In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision.  *Id.* at 416-17.  *See also Harvey v. Comm'r of Soc. Sec.*, No. 16-3266, 2017 WL 4216585, at *5 (6th Cir. March 6, 2017) ("In assessing whether a claimant meets a Listing, the ALJ must 'actually evaluate the evidence,' compare it to the requirements of the relevant Listing, and provide an 'explained conclusion, in order to facilitate meaningful judicial review.'" (quoting *Reynolds*, 424 F. App'x at 416); *Joseph v. Comm'r of Soc. Sec.*, 741 F. App'x 306, 311 (6th Cir. 2018) (same).

Listing 11.09 is defined as follows:

15

A. Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities; or

B. Marked limitation (see 11.00G2) in physical functioning (see 11.00G3a), and in one of the following:

1. Understanding, remembering, or applying information (see 11.00G3b(i)); or

2. Interacting with others (see 11.00G3b(ii)); or

3. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or

4. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. Pt. 404, Subpt. P, App. 1.

"Disorganization of motor function means interference, due to your neurological disorder, with movement of two extremities; i.e., the lower extremities, or upper extremities (including fingers, wrists, hands, arms, and shoulders). By two extremities we mean both lower extremities, or both upper extremities, or one upper extremity and one lower extremity." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A2, § 11.00D1.

"Extreme limitation means the inability to standup from a seated position, maintain balance in a standing position and while walking, or use your upper extremities to independently initiate, sustain, and complete work-related activities. The assessment of motor function depends on the degree of interference with standing up; balancing while standing or walking; or using the upper extremities (including fingers, hands, arms, and shoulders)."  20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A2, § 11.00D2.

The Listings further define the meaning of "inability to stand up from a seated position," "inability to maintain balance in a standing position," and "inability to use upper extremities."  20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A2, § 11.00D2a-c.

"Inability to stand up from a seated position means that once seated you are unable to stand and maintain an upright position without the assistance of another person or the use of an assistive device, such as a walker, two crutches, or two canes." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A2, § 11.00D2s.

"Inability to maintain balance in a standing position means that you are unable to maintain an upright position while standing or walking without the assistance of another person or the use of an assistive device, such as a walker, two crutches, or two canes."  20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A2, § 11.00D2b.

"Inability to use your upper extremities means that you have a loss of function of both upper extremities (including fingers, wrists, hands, arms, and shoulders) that very seriously limits your ability to independently initiate, sustain, and complete work-related activities involving fine and gross motor movements ..." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A2, § 11.00D2c.

The Listings further explain the meaning of the terms set forth in Listing § 11.09(B):

> a. Marked limitation and physical functioning. For this criterion, a marked limitation means that, due to the signs and symptoms of your neurological disorder, you are seriously limited in the ability to independently initiate, sustain, and complete work-related physical activities (see 11.00G3). You may have a marked limitation in your physical functioning when your neurological disease process causes persistent or intermittent symptoms that affect your abilities to independently initiate, sustain, and complete work-related activities, such as standing, balancing, walking, using both upper extremities for fine and gross movements, or results in limitations in using one upper and one lower extremity. The persistent and intermittent symptoms must result in a serious limitation in your ability to do a task or activity on a sustained basis. We do not define "marked" by a specific number of different physical activities or tasks that demonstrate your ability, but by the overall effects of your neurological symptoms on your ability to perform such physical activities on a consistent and sustained basis. You need not be totally precluded from performing a function or activity to have a marked limitation, as long as the degree of limitation seriously limits your ability to independently initiate, sustain, and complete work-related physical activities.

> b. Marked limitation and mental functioning. For this criterion, a marked limitation means that, due to the signs and symptoms of your neurological

17

disorder, you are seriously limited in the ability to function independently, appropriately, effectively, and on a sustained basis in work settings (see 11.03G3). We do not define "marked" by a specific number of mental activities, such as: The number of activities that demonstrate your ability to understand, remember, and apply information; the number of tasks that demonstrate your ability to interact with others; a specific number of tasks that demonstrate you are able to concentrate, persist or maintain pace; or a specific number of tasks that demonstrate you are able to manage yourself. You may have a marked limitation in your mental functioning when several activities or functions are impaired, or even when only one is impaired. You need not be totally precluded from performing an activity to have a marked limitation, as long as the degree of limitation seriously limits your ability to function independently, appropriately, and effectively on a sustained basis, and complete work-related mental activities.

3. Areas of physical and mental functioning.

a. Physical functioning. Examples of this criterion include specific motor abilities, such as independently initiating, sustaining, and completing the following activities: Standing up from a seated position, balancing while standing or walking, or using both your upper extremities for fine and gross movements (see 11.00D). Physical functioning may also include functions of the body that support motor abilities, such as the abilities to see, breathe, and swallow (see 11.00E and 11.00F). Examples of when your limitation in seeing, breathing, or swallowing may, on its own, rise to a "marked" limitation include: Prolonged and uncorrectable double vision causing difficulty with balance; prolonged difficulty breathing requiring the use of a prescribed assistive breathing device, such as a portable continuous positive airway pressure machine; or repeated instances, occurring at least weekly, of aspiration without causing aspiration pneumonia. Alternatively, you may have a combination of limitations due to your neurological disorder that together rise to a "marked" limitation in physical functioning. We may also find that you have a "marked" limitation in this area if, for example, your symptoms, such as pain or fatigue (see 11.00T), as documented in your medical record, and caused by your neurological disorder or its treatment, seriously limit your ability to independently initiate, sustain, and complete these work-related motor functions, or the other physical functions or physiological processes that support those motor functions. We may also find you seriously limited in an area if, while you retain some ability to perform the function, you are unable to do so consistently and on a sustained basis. The limitation in your physical functioning must last or be expected to last at least 12 months. These examples illustrate the nature of physical functioning. We do not require documentation of all of the examples.

b. Mental functioning.

(i) Understanding, remembering, or applying information. This area of mental functioning refers to the abilities to learn, recall, and use information to perform work activities. Examples include: Understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples.

(ii) Interacting with others. This area of mental functioning refers to the abilities to relate to and work with supervisors, co-workers, and the public. Examples include: Cooperating with others; asking for help when needed; handling conflicts with others; stating your own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples.

(iii) Concentrating, persisting, or maintaining pace. This area of mental functioning refers to the abilities to focus attention on work activities and to stay on-task at a sustained rate. Examples include: Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples.

(iv) Adapting or managing oneself. This area of mental functioning refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting. Examples include: Responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples.

19

20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A2, § 11.00G.

At Step Two, the ALJ determined that Christian's MS was a severe impairment. (Tr. 42.) The ALJ went on to provide the following analysis at Step Three:

> The claimant has multiple sclerosis, but the record does not demonstrate disorganization of motor function in two extremities resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities. Additionally, the record does not establish a marked limitation of physical function with a marked limitation in any of the paragraph "B" criteria. Accordingly, this impairment, singly or in combination does not satisfy the requirements of any impairment or combination of impairments described in section 11.00, *et seq,* of Appendix 1.
>
> * * *
>
> State Agency medical consultants who reviewed the evidence of record in response to the claimant's initial application and request for reconsideration concluded that the claimant's impairments did not equal the severity of any impairment or combination of impairments described in Appendix 1, Subpart P, Regulations No. 4 (Exhibits B-2-A and B-4-A). The record supports the opinions of the reviewing consultants at [sic] to this issue and they are incorporated as a finding.

(*Id.* at 44.) The ALJ also extensively analyzed the evidence regarding Christian's mental impairments. (*Id.* at 44-48.)

In determining Christian's RFC, the ALJ found as follows:

> As to the claimant's physical impairments, the record confirms that the claimant was diagnosed with multiple sclerosis in 2013. She had undergone appropriate treatment and relevant MRI scans have generally shown stable findings with no evidence of active demyelination. The most recent MRI scan in February of 2019 showed one new area of mild enhancement, but there is no corresponding clinical examination evidence of increased severity. The claimant alleged marked difficult [sic] due to fatigue and weakness, but physical examinations have consistently revealed normal muscle strength, coordination, and neurological function, with the exception of some diminished sensation to temperature in the upper and lower extremities. She maintains normal coordination and exhibits a narrow based gait with normal stride. The record demonstrates further that the claimant reports mild-to-moderate back, neck, and hip pain to her chiropractor. Despite her testimony of severe and debilitating pain, she reported pain levels of no more than 2-4 on a scale of 1-10 to her doctor and receives only conservative

treatment consisting of chiropractic adjustments.  The claimant is obese, which likely contributes to some added stress on her hip, back, and coccyx.  The record documents complaints of migraine headaches, but the claimant did not testify concerning headaches and she has not sought more than routine treatment consisting of office visits for her alleged headaches.  Dr[.] Koffman prescribed the claimant a cane and wheelchair as needed, but the claimant testified that she only used her wheelchair once or twice a month when she anticipated prolonged standing and/or walking.  The claimant testified that she experienced frequent flares of multiple sclerosis symptoms after overdoing in [sic] the day before, stating that these flares can last a day.  She then stated that she also experienced attacks of multiple sclerosis symptoms that could last from one-to-four months (Testimony).  However, while she alleged frequent flares and attacks, and has stated she believed she was having a flare or attack on several office visits, physical examination findings have consistently remained unchanged with no evidence of muscle weakness, incoordination, abnormal reflexes or motor deficit and her gait was narrow-based with a normal stride and no evidence of imbalance.  MRI scan performed in February of 2019 showed one new mildly enhancing lesion concerning for possible demyelination, but no other changes.

* * *

She testified that her legs were the biggest problem causing functional limitations and the reduced standing and walking involved [sic] sedentary work involves [sic] no more than occasional standing and/or walking and lifting no more than 10 pounds occasionally.  In addition, the use of a cane for ambulation and balance is permitted to account for the claimant's reported flares of lower extremity fatigue and weakness and grants maximum allowance possible to the claimant's allegations in this area.  The claimant alleged significant difficulty climbing stairs when she was having a flare or attack, but she exhibits normal motor function and coordination during physical examinations.   However, in light of those complaints, as well as her obesity, she will be limited to no more than occasional climbing of ramps and/or stairs.  She cannot climb ladders, ropes, or scaffolds because those activities exceed the exertional demands of sedentary work.  Given the lack of significant change in the clinical findings, and the claimant's allegations of difficulty using her hands repetitively, the claimant is once again restricted to no more than frequent handling and fingering bilaterally.  In light of the nature of multiple sclerosis, and the claimant [sic] complaints of difficulty with exposure to cold, she should avoid concentrated exposure to temperature extremes, as well as wetness and humidity.   Finally, and as a precautionary measure in light of her headaches, obesity, and flares of multiple sclerosis symptoms, the claimant should avoid unprotected heights and moving mechanical parts.  The record requires no additional restrictions from a physical standpoint.

* * *

21

> Consultative psychological evaluation by Dr[.] Griffiths noted average cognition with some reduced memory and distractibility.  However, he reported that she would with adequate pace and persistence [sic] and noted no findings that would suggest the inability to perform simple, routine, and repetitive tasks that did not involve fast-paced work activity.  She exhibited adequate concentration and attention with and [sic] no difficulty interacting appropriately.  The claimant alleges significant cognitive decline, but she home-schooled her children until this past school year and she exhibited average intellect to DR [sic] Griffiths.  As noted, she exhibited some distraction, but worked at an adequate pace with adequate persistence.  The claimant also reported, however, that she did well with simple, written instructions, but her ability to tolerate stress varied (Exhibit B-B-3-E).

(*Id.* at 49-51.)

Substantial evidence supports the ALJ's conclusion that Christian does not meet the requirements of Listing 11.09.  Christian does not argue there is any evidence the ALJ ignored or overlooked.  (Doc. No. 15.)  Indeed, it is clear the ALJ considered the testimonial, medical, and opinion evidence regarding Christian's impairments relating to her MS.  (Tr. 43-53.)  The state agency reviewing physicians considered the applicability of the listings, including Listing 11.09, and did not find any listing to be met or equaled.  (*Id.* at 343, 355.)  Christian does not challenge the ALJ's determination that the state agency reviewing physicians' opinions were consistent with the record.  (Doc. Nos. 15, 18.)

Of the evidence Christian sets out in her brief that relates to the requirements of Listing 11.09, much of it consists of her self-reported symptoms, rather than objective medical findings.  For example, while Christian reported intermittent gait imbalance when tired, difficulty getting up from chairs, standing, bending over, and left-sided weakness (Tr. 696-98, 689-90), on physical examination Christian's motor function and strength, coordination, and gait were all normal.  (Tr. 699, 691-92.)  *See Salter v. Comm'r of Soc. Sec.*, Case No. 4:12-CV-888, 2015 WL 1880393, at **11-12 (N.D. Ohio Apr. 24, 2015) (finding evidence insufficient to meet the criteria of Listing 11.09(A)).

22

Christian argues unpersuasively that the ALJ failed to "reasonably address" her need for a cane and a wheelchair and implies the ALJ misunderstood or mischaracterized her testimony regarding her need for a wheelchair.  (Doc. No. 18 at 2.)  The Court finds the ALJ explained her reasoning regarding Christian's need for a cane and a wheelchair, especially in limiting her to sedentary work.  It is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  While Christian argues there is evidence to support her position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Furthermore, the ALJ's decision, reviewed as a whole, contains sufficient information, reasoning, and explanation for the Court to conduct a meaningful review and conclude that the ALJ's Step Three finding is supported by substantial evidence.

## B.     RFC

Christian argues the ALJ erred by failing to contact Dr. Koffman for clarification "[i]n the event the ALJ did not believe" Dr. Koffman prescribed Christian a wheelchair to use outside her house "due to actual fatigue (as opposed to somatization)."  (Doc. No. 15 at 9-10.)  In addition, Christian asserts the ALJ should have afforded greater weight to Dr. Koffman's opinion, as he prescribed Christian's wheelchair. (*Id.* at 9.)  Christian further argues the ALJ erred in failing to account for Christian's need to use a wheelchair at work.  (*Id.* at 12.)

The Commissioner responds that substantial evidence supports the ALJ's RFC findings.  (Doc. No. 17 at 8.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 404.1545(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(d)(2).  An ALJ "will not give any

23

special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 404.1527(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 404.1546(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc.*

24

*Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

With respect to Christian's argument that the ALJ erred by failing to recontact Dr. Koffman for clarification, the ALJ determined she had enough evidence before her to decide whether Christian was disabled and therefore did not need to consider obtaining additional information. *See* 20 C.F.R. § 404.1520b(b)(1)-(2).

Regarding Dr. Koffman's "opinion," Dr. Koffman offered no medical opinion in this case. To the extent Christian refers to the wheelchair prescription itself, that document is not a medical opinion. "A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in four enumerated abilities. 20 C.F.R. § 404.1513(a)(2). Since the wheelchair prescription was not a medical opinion, the ALJ was under no obligation to evaluate the persuasiveness of any findings therein.[5] 20

---

[5] Since Christian's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See*

C.F.R. § 404.1520c; *Pierce v. Comm'r of Soc. Sec.*, Case No. 3:16-CV-421, 2017 WL 1017470, at *1 (N.D. Ohio Mar. 16, 2017) ("Because Dr. Qureshi did not give a medical opinion, the ALJ had no obligation to give any particular weight to Qureshi's findings.") (citing *Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007)).

Finally, for the reasons discussed above in the Step Three analysis, the Court finds the ALJ did not err in determining Christian did not need a wheelchair to perform sedentary work.

Substantial evidence supports the ALJ's RFC findings.

## C.    Subjective Symptom Analysis

Christian argues the ALJ erred in failing to conduct a proper credibility assessment by not considering "properly" how severe her fatigue is, how much her fatigue interferes with her daily activities, and her testimony regarding her MS flares and attacks.  (Doc. No. 15 at 11.)  While it is unclear whether Christian intends to raise this issue as an RFC or subjective symptom error, she also asserts the ALJ mischaracterized her ability to perform some daily activities as proof she was not disabled.  (*Id.* at 12.)

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). *See also* SSR 16-3p,[6] 2016 WL 1119029 (March 16, 2016).

---

*Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c.

[6] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016.  Thus, SSR 16-3 was in effect at the time of the November 2, 2018 hearing.

If these claims are not substantiated by the medical record, the ALJ must make a credibility[7]
determination of the individual's statements based on the entire case record.  Credibility determinations
regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human
Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir.
2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The
ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See
Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, the ALJ's
"decision must contain specific reasons for the weight given to the individual's symptoms ... and be
clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated
the individual's symptoms."  SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ
rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ
must look to medical evidence, statements by the claimant, other information provided by medical
sources, and any other relevant evidence on the record.  *See* 20 C.F.R. §416.929; SSR 16-3p, 2016 WL
1119029 (March 16, 2016).  Beyond medical evidence, there are seven factors that the ALJ should
consider.[8]  The ALJ need not analyze all seven factors but should show that he considered the relevant

---

[7] SSR 16-3p has removed the term "credibility" from the analysis.  Rather, SSR 16-3p directs the ALJ to
consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms,"
and "evaluate whether the statements are consistent with objective medical evidence and other evidence."
SSR 16-3p, 2016 WL 1119029, at *6.  The Sixth Circuit has characterized SSR 16-3p as merely
eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an
examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 Fed. App'x 113, 119 n.1
(6th Cir. 2016).
[8] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and
intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type,
dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate
pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for
relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to

evidence.  *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Christian's testimony and other statements regarding her symptoms and limitations.  (Tr. 48-49.)  The ALJ determined Christian's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  (*Id.* at 49.)  However, the ALJ found her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with medical evidence and other evidence in the record for the reasons set forth in the decision. (*Id.*)  Specifically, after reviewing the relevant medical evidence, the ALJ found:

> The claimant has received only routine and conservative care for her alleged impairments and her condition has remained essentially stable throughout the relevant period.  She alleged marked fatigue and weakness, particularly in her lower extremities, but physical examination consistently reported normal muscle strength, muscle function, and coordination.  The claimant reported using a cane daily, which is taken into account in the above-described residual functional capacity.  She has a prescription for a wheelchair, but reported that she only used it once or twice a month when she expected to perform prolonged standing and/or walking.  Sedentary work by definition does not require prolonged standing or walking.  The treatment records document some mild progression in her objective findings, but no changes in the clinical findings, and those changes are accounted for by limiting her to sedentary work.  The claimant also reported that her daily activities were significantly limited and that she performed few household chores. However, those allegations are difficult to reconcile with the normal muscle strength, reflexes, coordination, and gait consistently reported by the claimant's neurologist.  In addition, her allegations of frequent flares and attacks of multiple sclerosis symptoms are supported only by her subjective allegations in light of the generally normal examination findings.  Taking those factors in consideration, the claimant's reported limited daily activities are outweighed by the other factors discussed in this decision, including the objective and clinical findings of record.

(*Id.* at 52.)

---

relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

The Court finds substantial evidence supports the ALJ's assessment of Christian's subjective complaints.  The record evidence, as noted by the ALJ, is not entirely consistent with Christian's allegations of disabling conditions.  (*Id.* at 44-53.)  Contrary to Christian's allegations, the ALJ credited some of Christian's subjective symptoms but did not accept them to the extent alleged by Christian because of the normal examination findings regarding muscle strength, coordination, and gait, a factor to be considered under the regulations.  (*Id.*)  With respect to Christian's homeschooling her children, the ALJ acknowledged she had stopped doing so a year before the hearing and this was one factor out of many the ALJ considered as part of the subjective symptom analysis in the decision.  (*Id.*)  Furthermore, the ALJ's extensive discussion of the relevant medical evidence included several findings that undercut a finding of disability.  (*Id.*)

The ALJ referenced Christian's allegations and then contrasted them with the medical evidence, including examination findings, as well as the opinion evidence.  (*Id.*)  Reading the decision as a whole, it is clear why the ALJ did not accept the entirety of Christian's allegations.  *See* SSR 16-3p, 2016 WL 1119029 (the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.").  The Court is able to trace the path of the ALJ's reasoning regarding the ALJ's subjective symptom analysis.  Therefore, the Court finds there is no error in the ALJ's subjective symptom analysis.

## D.    Step Five

In the heading of one of her arguments, Christian asserts the ALJ erred by failing to "address the wheelchair issue further with the vocational expert."  (Doc. No. 15 at 9.)  In a single sentence, Christian argues, "The ALJ should have made further inquiries if she did not believe the Claimant must use the

wheelchair outside of the home due to her MS, as that would surely impact the testimony of the vocational expert as to whether additional accommodations would be necessary." (*Id.* at 10-11.)

The Commissioner did not respond to this argument.  (Doc. No. 17.)

To the extent Christian intended to raise a Step Five argument, the Court finds Christian waived this argument by failing to develop it. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.'") (citations omitted).  It is not for this Court to develop Christian's arguments for her.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: August 4, 2021                             *s/ Jonathan Greenberg*
                                                Jonathan D. Greenberg
                                                United States Magistrate Judge